24-1094 et al. Appalachian Voices et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Luckett for the Petitioners. Mr. Perkins for the Respondents. Mr. Morrell for the Interveners. Good morning, Council. Mr. Luckett, please proceed when you're ready. Good morning. May it please the Court, my name is Ben Luckett, and I represent the Petitioners. I'd like to reserve two minutes of my time for rebuttal. Under the Natural Gas Act, FERC may not allow a company to maintain a placeholder certificate for a project that it has stated it will not build while the company plans and seeks approval for a new, substantially different project. Here, FERC's extension order and rehearing order did precisely that. Those orders allowed Mountain Valley to maintain its certificate and the extraordinary power of eminent domain along with it, even though the Commission knew that Mountain Valley had long ago abandoned its plans to build the approved project and had yet to determine that the new, larger-capacity project was required by the public convenience and necessity. That unprecedented set of facts renders FERC's finding of good cause to grant the extension arbitrary and makes clear that the information underlying FERC's balancing of public benefits and adverse impacts in the original certificate has grown stale. The Court should thus vacate the extension order and with it the certificate for the original project. FERC's finding of good cause was arbitrary for the simple reason that the company had abandoned its efforts to pursue the project approved in the certificate more than a year before the extension order. FERC has stated that good cause for a certificate extension can be shown by a project sponsor demonstrating it made good faith efforts to meet its deadline but encountered circumstances that prevented it from doing so. But this is not the typical case where FERC grants a short extension because a developer diligently pursued its project but was thwarted by outside forces, such as the MVP mainline litigation delays cited by the Commission. But it was not those delays that set Mountain Valley's project back. Instead, Mountain Valley abandoned its efforts to secure permits and property rights for the approved Southgate project in 2022. Its need for an extension was not a result of unforeseen outside forces but the company's own decision to pursue a markedly different, larger-capacity project. Does everything on this axis of your argument, does everything turn on it being markedly different? I think you wouldn't disagree that you can have changes that wouldn't require every single time there's even an iota of a change you have to start over. That's correct, Your Honor. It is the significance of the differences here that we're having an all-new precedent agreement, a much larger capacity pipeline, more emissions coming out of that pipeline. So it is altogether the significance of the difference, yes. At the relevant time when the extension was approved, the amendment had not been formally proposed. Is that right? That's correct, Your Honor. But at the time of the rehearing order, FERC was aware that the project as originally approved would not proceed. Right. And how do you define something as being markedly different? Because it's proceeding along the same path. The decatherms actually went up in some respects. The physical path is shorter. I mean, something's got to be an amendment, too. There's got to be some circumstances in which even if it's a reasonably significant change, it still counts as an amendment rather than an entire abandonment. And it just seems like as a general matter, that's the sort of distinction as to which an agency gets some leeway to draw a divide between when you're just throwing something aside and starting from scratch and when you're making adjustments to something that's already been the subject of consideration. Yes, Your Honor. Well, when you have changes that are so significant that you have an all new precedent agreement, the primary basis of the commission's finding of public convenience and necessity is no longer valid. There's a new agreement and it's not and it's not for the same deliveries that were originally contracted for. We have deliveries to new delivery points. That's not answering the question. You're assuming the answer you want. The chief was asking you, how do you make that determination, amendment versus abandonment? I don't know about a bright line, Your Honor, but in this case where you have all new... And especially how do you make it when they haven't even requested an amendment yet? Well, Your Honor, what they had told the commission at that time was they did not plan to build the project as approved. Has there been any formal submission indicating we will be proposing an amendment? Is that on the record yet, formally? At this time, there has been, Your Honor. That was included in a Rule 28J letter submitted by the company. But that amendment was not in front of FERC at the time it issued the rehearing order. But the project update from the company stating that it was no longer going to be building the approved project, that was in front of the agency and that they were... There has been no approval of whatever that change might be, right? That is correct. But the company has made clear that they will not construct... By the way, I just want to make sure I have it straight in my head. Whatever it is they may be thinking, it cannot happen until there's approval, right? That's correct, Your Honor. And there has been no approval, right? That is correct. And if you go through the process of amendment, considerations of the sort that you're talking about would be raised, is that right? This is really not an amendment. It's really an abandonment. There are environmental concerns. It's different, whatever. All of those questions now come back into play, yes? Well, whether you style it as an abandonment or a significant amendment, the fact remains that the company made clear they do not intend to build the project... I hear you. I hear you. Let's assume that's a given, that I couldn't really debate that. I'm just trying to get a picture. There has not been any approval of a change. Whatever you call it, abandonment or amendment, has not been approved. So right now, the only thing approved on the books is what was originally approved, right? That's correct, Your Honor. So we don't know what will happen. If and when there is a process to change this thing, it would have to take account of all of the questions you're raising, right? We believe so. Now, whether FERC would actually take account of those in amendment proceedings... No, no, no. In your view, surely your view would be that if they come back to amend and seek an amendment, the things that we're raising now are surely in play, is that right? That's true, Your Honor. Your Honor, the problem is that the company retains the power of eminent domain and indeed says they intend to obtain the easements by the end of 2025 for this new project. They say, we're going to get the easements for this new project by the end of 2025, not to build the old project. When, as Your Honor says, that project has yet to be approved. How do you get eminent domain on an assumption that you have the right to build a new project, which has not yet been approved? Well, that's exactly what the assumption that FERC is allowing to maintain by allowing this place... But FERC wouldn't be in control of that. Precisely, Your Honor. FERC has allowed to... Eminent domain would not be before FERC, right? No, no, Your Honor. Before the tribunal that makes that determination, you would have to say some of the things that you're suggesting, which are not yet true, because you're asking for approval to do something based on something that has not yet been approved. Is that right? Well, that's not what Mountain Valley says, and it's not clear that FERC believes that. Mountain Valley says on page 24 of their brief that by leaving this, the existing certificate in place, that FERC has determined that the portion of the route that will stay the same is in the public, is required by the public convenience and necessity. And they say they will go... Have they de facto approved the amendment? They have not approved the amendment. But the way you just said it suggested they would be able to honestly say that. No, Your Honor. I'm not getting it. They either have or have not. If they have not approved an amendment, I'm not sure how anyone, although in this world, know anything is possible. I'm not sure how an amendment can be assumed to be in place justifying eminent domain and whatever else comes with it when no one has approved it. The problem, Your Honor, is that the commission has left the underlying certificate in place. And what the commission has said is when a certificate is in place, FERC has no authority to prevent the use of eminent domain. So what we have here is a company that has a certificate for a project it will not build is using that project to negotiate with landowners under the threat of eminent domain to take parcels. And that's including one of the plaintiff's members. Can I ask you, so suppose we didn't have a case involving an extension order at all. And we just had an original project that then was sought to be adjusted. So we have a time frame. You're going to know this way better than me, but whatever the normal time frame is for a project, let's say it's 10 years or something, if that's permissible. And then at some point in the midst of that, there's a determination made by the entity that's carrying out the project. Actually, we got to do this differently than we thought initially. And then I assume that you have to go to the commission to get approval to adjust. Then wouldn't we be in the same situation that whatever has been approved had been approved. There's an adjustment on the table. And then there's some process by which there's a determination made as to whether whatever was within the fold of the original approval, including the power of eminent domain, can continue while the proposed amendment is in place. We're not in extension land because we're still within the time frame of the original project. Would we still have the same dynamic that you're talking about no matter what? Possibly, Your Honor. But here we had a decision point where FERC was required to make a determination that its findings of public convenience and necessity for the project remained valid. Because of the extension. Because of the extension. Right. I'm just trying to understand. This is a practical matter. I honestly don't know the answer. I'm just trying to understand. If we didn't have an extension case, you're right that this case comes up in the context of an extension. And therefore, there's a determination that was made to grant the extension that is ripe for challenge. And you brought that challenge. I'm just trying to understand practically what the difference is vis-a-vis some of the things that you're outlining as principally at issue here. The continuation of the power of eminent domain and those sorts of things. It just seems like that kind of dynamic could also play itself out in the absence of an extension. And then this case happens to involve an extension. But if you had the same set of circumstances happening in the absence of an extension, then we'd be exactly where, I think, unless you disabuse me of that notion, we'd be exactly where we are right now. But there wouldn't be an opportunity to have a ripe challenge because there wouldn't have been an extension. Unless there's something that can happen in the course of that that says somebody can come in on an emergency basis and says, look, if this project is going to change this extent, then the original approval can't possibly cover this. And so you have to cut this off right now. Maybe there's a way to do that. And that means, as Judge Edwards was saying, then the amendment process already accounts for that and has within it an ability to deal with this dynamic. But it just seems like what we're doing here is there happens to be an extension. The temporal dimensions of this make the extension salient. And therefore, all the load bearing weight is going to be borne by the approval of the extension when we've already got this process that could replicate even without the extension. And so there has to be some way to deal with it, even in that context. But I may be missing. I think the extension is an important aspect of it because one of the reasons for including these deadlines, you know, which are required by regulation, is that all the findings will remain valid. And so when you're having major... With respect to the unamended project. That's all. I just... I don't know how else it could cover anything else. The only thing, the fight over now, it's kind of a weird fight if, in fact, there is going to be an amendment. Because we're fighting over the approval of something that you're saying the other side agrees is not going to be done. It's kind of like, well, so what? Including eminent domain. Now, I can't say that I've sat and researched eminent domain and know the answer to this question. But I don't know how you can honestly get approval to do something based on something that doesn't yet exist because it hasn't been approved. Well, I would just again point to Mountain Valley's understanding on page 24 of their brief where they said that the part of the route that is the same, even though there's going to be a larger diameter pipeline, which would require a larger trench. They said FERC already found that this first part is required by the public convenience and necessity. They take that because FERC left the certificate in place. And they intend to use that to go ahead and assert eminent domain and assert to obtain property. Not on the parts that under the amended plan are no longer part of the project. On the parts that were part of the approved project and remain it. That's their representation. Now, with that certificate in place, under FERC's interpretation of their law, there's nothing FERC could stop them from doing now from going to that portion of North Carolina that they don't intend to build and taking properties for some future use. So this certificate is in place granting eminent domain authority along the entire pipeline route. Now, Mountain Valley says they're not going to use it, certainly not along the southern portion. But that's an unenforceable promise. And your concern is focused on which part? The part that was was in within the original approval, but it's not within the amendment or the part that was is still within the amendment. Both I think the concerns about the southern portion of the route that are not within the amendment are, you know, a little farther afield. We are concerned about the company waiving a certificate for a project that it does not intend to build to pressure landowners to sign easements for a project that has not yet been found by FERC to be required by the public convenience. And then let's go back to the hypothetical situation in which there's not an extension and we still have the same dynamic. What would happen? Is there a way to go to the commission and say, look, you approve this there? Actually, it turns out there's an amendment on the table that's only going to be one quarter of the length of the original project. There's still a concern that there's going to be eminent domain exercised over the remaining 75 percent. That's not part of the project and also the original 25 percent. You've got to put a stop to that. Is what is there a way for that practically to happen? I don't know how that would happen in front of FERC, Your Honor. But again, the fact that this could this that, you know, sword that hanging over these landowners of the improper use of eminent domain could now go on indefinite. You know, we have a construction for Mountain Valley thinks it won't complete this project now until June of 2028, even though the extension sets a deadline of June of 2026. So, you know, that's one of the problem again and why and why these extension orders are important and should be taken seriously by the court. My colleagues don't have additional questions for you and we'll get we'll we will give you a bottle. Thank you, Your Honor. Thank you, counsel. Yeah, I think. Sure. May it please the court Jason Perkins for the commission and just to jump right in on a lot of the questions that were already asked. Though the amendment has not been approved yet. It is pending before the commission. There's an open comment period now about the amendment. And so the only thing that has already been approved by FERC is the original project route. And so amendment proposals before the commission. Currently, before the commission, there's no guarantee as to how the commission will rule on it. It's possible that it could be denied as possible. It could be approved as possible. It could be approved with new or different conditions. And so that is an open question. So, before the commission. And in terms of questions about, you know, the scope of the amendment authority, I think that the court was exactly right. The agency should get leeway in the situation because it is a procedural question about how the commission will make decisions about potential changes to an already certificated project. We know from a lot of the cases cited in the briefs that project amendments do happen project sponsors sometimes need to change routes to avoid resource issues or other types of permitting issues. And so that is the sort of flexibility that the commission allows to project sponsors to exercise because the idea is project sponsors will know best how to actually implement the building of the project. And if there are changes that the project sponsor decides would be able to better able to make the project actually happen, the commission should be open to that to now make everybody start back again at zero. If something. Somewhat unexpected comes about. Is this true mountain valley voluntarily dismissed all eminent domain actions in North Carolina when it became clear that. That portion of the route would not proceed. As far as we know, that's correct. We're not disputing that. Those are the basic facts. I think the intervener could explain better exactly what happened there. But, as the commission explained as to the good cost standard. The main line delays possibly in this project, and there were permitting challenges that this project faced. And so the good cost standard was well met under these circumstances as explained in the extension order. What would happen in a situation where you don't have an extension order? How would that play out? Right. So that would be a situation where the. The product sponsor would have to come back and explain the type of changes they would like to make. And we only have 1 set of facts that the commission actually rolled on in a circumstance. But that set of facts includes essentially. The idea that this project will move gas down from the end of the main line to North Carolina. Serving the same 1 and same anchor customers. And potentially an additional customer, and so it is. And so the commission looked at that and rehearing orders, paragraphs, 13 to 16 and said, that seems like the same project purpose. That seems like a change to the facilities and so there would need to be an amendment because the. The approval is specific to the exact facilities proposed, but it seems like you're trying to do the same general thing. And so that is an appropriate situation where an amendment should happen, but we don't have a precise analog to this case. And then in the amendment process. Then they, I take it when the amendment process. The commission's consideration of the amendment is occurring, then the same kinds of concerns that have been raised here will be folded into the. Decision whether to approve the amendment. Right, so we're hearing order paragraph 16 talks about review under the appropriate statutory authorities and review under NEPA. And so the process looks somewhat similar to an initial new certificate application in the sense that you're proposing new facilities. We have to study those facilities, but the main difference being the commission's already approved in general, the idea of the project purpose and how you originally intended to carry it out. And so, in most cases, that's going to be a more truncated review because of everything that's already been decided. And so, in that paragraph, the commission is acknowledging that we will still study this under natural gas act. We'll still say this under NEPA. We will get full airing of any new issues that come up as a result of it. And it's cited in the application that Mountain Valley submitted to FERC, but there's a case called LA storage that's cited in that application. And it basically looks through what the commission already approved and what changes to the information might have happened in the meantime. So, that type of analysis is what happens in an amendment proceeding. And so the exact scope of it depends on the facts, but usually the commission is looking back to what they've already approved, any changes to what they've already approved, and any new information that came up in the meantime. Do you agree that what is facially before us, I'm sorry, the proposed amendment to any reasonable person would be seen to be markedly different from what was originally approved? It is different in terms of... Markedly different. In other words, to me, uninitiated, this is not my field of endeavor. It looks markedly different. Yes? It is still trying to accomplish the same general... Can you go with me? I don't think it's markedly different because... Very different. Not very different. Not insignificant. It is... Come on, Counselor, it's not a trivial amendment and it's on, it's in play now. That's right. Okay. It is a significant... We have a proposed amendment that is significant. That's correct. Okay. Now, if that's the case, there's a... Looking at it from our vantage point, there's a proposed amendment to this entire thing that is not insignificant. Why can't I conclude this is not right for our consideration, come back when this is all done? Because we don't know what FERC is liable to do in the amendment process when they take all of these things into account with respect to a significantly different project than the one they first approved. I think that makes sense as applied to the request for further study of new facts and circumstances that may be part of this case. As to the extension, that is on separate grounds. So the extension deals with circumstances that were in place as of 2023. The scope of what's happening with the amendment and how FERC will study it, that's right. It's a future kind of concern. So the request for further study of market need and NEPA consequences, that will be part of the future case. Why would we, as a court, see fit to approve or disapprove an extension when really all the information is not properly before us? FERC hasn't considered everything yet. I think we did consider the basis for the extension. If you looked at the amendment and it's markedly different, there really are some concerns now with this new project. One possibility in that fight is FERC would say, no, this is, you've gone too far. I think that does remain possible in the future case. Then why would we decide this now? When the one possibility is FERC could say, no, we're not going to, now that we're digging in and looking carefully and everyone is being heard, this is a completely different project. And maybe you have a right to do it or not do it. But we need to hear more and assure ourselves on need, the environmental issues, and all the other questions, because this is a different project now. Right. I think that is possible. The commission did say, in general, based on the representations in the record, the certificate amendment was the right procedural approach here. But you're right that the actual proposal was not before FERC. So there wasn't total. I know we're at a new stage now. There is an amendment before the, it's the kind of thing that we will sometimes say, no, we shouldn't consider this yet. There's more to be done. Right. And that is something the court could decide to do, you know, as a matter of managing this case. I would say that the commission will eventually study the amendment application in detail and render a judgment on it. And what happens in a situation in which the commission gets an amendment that it feels is so significant that the prior approval just can't really govern this anymore because we're effectively talking about a new project? Right. So the hint that we get from that, from the commission's past cases, at the end of the Chestnut Ridge storage order, there's the idea that that applicant who essentially did stop developing that project had their certificate vacated. But that was without prejudice to a new application if they decided that they wanted to pursue it again. And they were told that they could rely on any findings that still remained valid. So there would be a situation potentially where the commission finds an amendment is significantly different, very different, markedly different, however you want to categorize it, and decides that that process is going to have to take so long and go into so many new and different issues. It's basically the same thing as if you made a new application. Right. And so the commission might have that back and forth with an applicant, ask for more data, ask for more information. There might be multiple comment periods. It could get very long and drawn out as a result. I don't know that it's based on the formal labeling of whether it was labeled as new or labeled as an amendment, but functionally the commission will need to have a full set of information before it can make a decision, and it might be further away from that if the changes are markedly or drastically different. And then what happens to the approval that's in effect in the interim? So suppose you have a situation in which a project's been approved, project sponsor, and I think I now have the term project sponsor, comes back and says, actually, we want to adjust this. And then the commission looks at it and says, okay, that's an adjustment. But, man, that seems like quite a significant adjustment. That may well be the sort of situation in which it's functionally a new application. Then, I mean, in litigation, you know, we think about TROs and preliminary injunctions and things, and I'm just wondering what happens with the authority, the approval, when FERC gets the commission gets something that looks to be a tantamount to a new application. Then does whatever is approved and what comes along with that stop while the new application is being considered? Because you don't get the approval in advance of approving a new application. Right. So it takes us a little bit beyond our cases so we don't have an exact analog, but the original approval would remain in effect during that period of time the commission originally decided that the circumstances would still be valid or still be in place. So it is possible for the project sponsor to keep moving forward with the original project while they're contemplating changes to it. It's possible to what? Say that again. The project sponsor can continue on with the original project while they are contemplating changes to it. I think the approach is flexible in that regard. Whether or not there should be, like, a stay imposed on the existing certificate while the changes are working their way through, that's the case that we don't have clear guidance from how the commission exactly handled that. But there could be, you know, a claim or a good basis to say that the project sponsor has officially abandoned the project, that they are actually pursuing something that is totally different. And, again, only one set of facts here, but you can imagine that if you're talking about connecting two entirely different parts of the natural gas transportation infrastructure, if you're talking about serving totally different customers, if it really does look like you're trying to do something completely different, then there might be a basis to say that, well, you've actually abandoned the thing that we approved, and so you should start over. We don't have a case that exactly says that, but you could imagine a situation. And if you get to the level of abandonment, then does that mean that then the approval that's in effect is no longer in place, and therefore you can't go forward? Essentially, in the cases where a project sponsor has officially said that they are abandoning it, I believe the Penn East case wound up that way. If you're not going to build it, then the commission will vacate the certificate. In circumstances, the circumstances get more complicated if you started construction and then you decided you weren't going to finish it, in which case the commission might hold the certificate open just to ensure that the remediation has been completed for whatever ground you disturbed. But in a situation more similar to this where no construction has happened, then once the project sponsor says we are affirmatively not going to build this anymore, then it gets vacated. And one of the reasons why is that other potential competitors might step in and say, well, we'd like to serve that need instead. And while there's a certificate in place, that might ward them off from moving forward because somebody else might decide to build and serve that need. But they haven't confronted the situation in which it's not that the project sponsor voluntarily says we're abandoning, but they come with something that's different, and somebody might be able to say, even the commission itself could say, well, look, this is functionally an abandonment. We don't have a precedent in which the commission deems something to be an abandonment, even though the project sponsor didn't itself volunteer that it was an abandonment. Right. I'm not aware of a case exactly like that. And the other thing that makes it strange is to request an extension in the face of what any reasonable person would say is a significant abandonment. It doesn't make a whole lot of sense. Extension to what? Because everyone, let's assume, assume everyone agrees, no, this is a really major change. So how can you measure the amount of time that would be necessary to achieve what everyone now agrees is really on the table? So the prior certification becomes kind of silly. Why are we even talking about that? Because that's not the project anymore, and the person seeking to have the certification agrees that's not the project anymore. I don't know how you just easily split it and say, well, this is just an extension case. But it's an extension with respect to something that's been approved, hypothetically, is not on the table anymore because the person who wants the certification agrees, no, that's not what I'm going to do. And what I'm going to do is significantly different from what I got approval to do. I think the interveners can speak to what their reliance might be on the certificate in the interim. But I understand what the commission said in the hearing order to be, because you're attempting to provide the same general purpose, the project certificate shouldn't be shut down in the interim, that you can continue to think about how you're going to change the project. Because, again, the ultimate purpose, and I believe we cited, quoted back to the. What does same general purpose mean? More gas? It becomes kind of silly to say that. Same general purpose? Because providing more gas one way as opposed to another way, maybe everyone would agree, they're completely different projects. How you do it matters. But if you're saying same general purpose trumps, that ignores the real question. Do we have the same project here? It's no answer to say, but in either project, even though they're completely different, we're going to be offering more gas. So what? It's offering more service to the same, one of the same customers. I think that's a key point. One of the same customers with the same delivery points. So it is not completely. Yeah, but how you get there, that is the people who are being affected on the roads on the way, right? Right. Okay, so I'm not sure saying we're going to be offering more in the end either way. Well, maybe, but it's a different project. I don't know. I'm just saying hypothetically.  Okay. Thank you.  Intervenors now.  Good morning, Your Honors. May it please the Court, Jeremy Marwell for Intervenor Mountain Valley Pipeline. If I could briefly speak to what is before the Court and what is not before the Court, talk to whether it is the same or a different project and provide some information about eminent domain. But, of course, I'm happy to answer the Court's questions. In our view, what's before the Court today is only the question of whether the Commission reasonably exercised its discretion in granting the extension. Given the rationale the Commission gave and the Commission's past orders and the framework, the basic point is, did the information that the Commission previously analyzed, had it become stale in a manner that undermined the continuing validity? And the Commission explained as to both need and environmental impacts, it did not find staleness. As to whether this is because they haven't taken into account the breadth of the proposed amendment. That's why I threw out the possibility. I don't mean to interrupt you, except I do. That's why I threw out the possibility of unright. You now are presenting to us something that is different than the case that I originally started preparing. The suggestion being made that this may be substantially, everyone's agreeing, significantly different. And how much more we say about it, no one's sure. So maybe I could speak to that, because I think it's important. Two things on, is it the same project or a different project? The first is, I think that is the judgment that the Commission made in the first instance, given its expertise and its background with this project. It made that judgment saying, we think it is appropriate to grant an extension of the existing certificate. We understand that an amendment is coming in. And this is in footnote 24 of the extension, sorry, the rehearing order. They said, we think as to the changes, the appropriate way to manage that is the amendment application that is forthcoming. We have now filed that two weeks ago, and that process is undergoing. So I think that falls comfortably within the Commission's discretion in adjusting a deadline it had set three years earlier. But is it the same project or a different project? Let me try to convince you that it really is the same project, and that under this Court's standard of review, there is substantial evidence to support the Commission's determination that this was the right way to go, that you didn't have to start over from scratch, essentially vacate the certificate and start over. This, in terms of the record, would be JA360, JA410 to 411. And then if you are interested in looking at it, our amendment application, which was filed two weeks ago, we put in a 20HA letter that is available to you in terms of what we are actually proposing. But what did the Commission know at the time it granted the extension? We told them it was going to come from the same place. In other words, you're going to get gas from the main line and one other place. It has essentially the same route in Virginia. You can think about this as a Virginia to North Carolina pipeline. We're going just across the border into North Carolina. We are serving the same shipper, the anchor shipper, which is a local gas distribution utility. So, Judge Edwards, when we talk about need, yes, it is important how you get there. But we are giving gas to a local distribution utility that is going to serve its service area in North Carolina. And it's the same shipper, the same shipper that supported the original certificate. Now, we told the Commission that we expected and we had entered into an additional contract, that is with Duke Energy, for additional capacity. And that's why we have to make it from a 24-inch to a 30-inch pipe. But we told them, and then the receipt point, as originally certificated, we had one receipt point just over the border and one about 40 miles south. The one just over the border is the same. Now, we've taken away the 40 miles down into North Carolina, and with that we've taken away the second receipt point. But from our perspective as the developer of a project, we are serving need for a customer who's going to use the gas to serve the same general area, its customers. And any of the changes, which I agree, we fully agree, will be ventilated in the forthcoming amendment application. We were making these changes to be ameliorative in response to these obstacles that we had encountered. So there was concern about a compressor station and potential air emissions. We redesigned the project. There will be no compressor station. There was concern in North Carolina about impacts on water. We've taken away 40 miles of the pipe in North Carolina, completely avoiding those areas. And I think one way to think about this case is, did the commission reasonably conclude that we didn't have to start over, they would give us some more time to work through these issues, and that instead of trying to front load all of this review into the decision whether to grant an extension, the commission would wait, receive the formal amendment application, and do all of that review there. And the difference between that and what petitioners are proposing is that the amendment can focus on what has changed, what is new. Let me ask you this. Am I right in assuming, Mr. Morrill, that it's inconceivable that the new amended project can be finished within the extension period? It's not conceivable. Everything I've read suggests that that's not even an interesting debate. It is not going to happen. No conceivable way. Yeah, you're smiling because you know that's right. The answer to that question is clear. They will not finish within the extension period. And so I come back to my original concern is, why in heaven's name would we be fussing over approval of that extension date now, when we know it's meaningless? Well, so it is not meaningless to us. Am I right in my assumptions? There's no conceivable way. If you were a betting man, if we were taking bets, you and I'd bet the same way, right? It's not going to happen. So what we told the commission in December, this is at JA360, was once we had the contracts with the existing customer and the new customer, we said 2028. And you are right. 2028 is later than 2026. Why did we ask for only three years? Well, we were asking in June before we had gelled the contracts. That was a request that we thought was within the wheelhouse of what FERC had given in other orders. And we thought it was potential. These are complicated projects. We have very able adversaries who I'm sure will bring any shortcomings to the attention of the relevant courts. And as you've seen from the main line, the permitting and litigation pathway is not always linear. So, yes, we are going to do our best. We have contractual obligations to our customers to get this done as quickly as we can. And I take your answer to be it. I agree judges are not likely, but we still should be allowed to proceed. And if that's true, then FERC is keeping us on a short leash by giving us three years. We'll have to come back again. That should be something. That's the question. So if it turns out, as seems quite likely that it's not going to happen by the end of the extension period that's on the books, then I assume you have to go ask for another extension. Correct. Now, and then that's subject to review. We might be here for Southgate 3 or possibly Southgate 4. Now, you know, in the amendment we described to the commission, this is the pending amendment, Judge Edwards, that has not been acted on. We described to the commission our expected time period, both for permitting and for construction, and that's the 2028 figure. You know, the commission will take that into account, and we hope we'll issue an order granting our amendment somewhere down the road. And it may or may not say something about the time. Again, these are deadlines that the commission sets as an exercise of its own discretion. The extension doesn't get folded in. The second extension doesn't automatically get folded into the amendment request if the amendment itself presupposes that it will happen until 2028. So I wouldn't want to foreclose. I mean, obviously, that's up to the commission. One factor here that might be helpful to the court is the commission has a policy, and this is cited in footnote 17 of our brief, that you shouldn't ask too soon. In other words, you wait until 120 days before your extension. And I think that's motivated by the notion that they don't want to have to deal with extension requests that maybe you won't wind up needing. Yes, you have to wait. You have to wait months before the end of the extension period in order to request before you make the request. Yes. And then the commission will provide notice and go through its process. If they don't act by the time, as long as you've sought, you've timely made the request, your deadline will be told while the commission is thinking about the request. But that's why we're trying to comply with the commission's policy. That's why we waited until close to the deadline and why we didn't, I guess, request another extension. Some of the items that you enumerated earlier to the effect that it's the same customer, various considerations that in your mind make it seem like it's an amendment of the same project rather than starting over with a new project. That was all folded into the amendment request that you filed with FERC. That wasn't, you're saying that those things are part of that amendment process. It's not that it was before the commission in connection with the extension. Right. So what the commission knew at the time it was, well, the commission, what the commission had before it at the time of the extension and then also at the time that it was acting on the rehearing was primarily our letter of December 29th, which is a J360. And there we described what we could about what was coming. Obviously, that was December and that took us until February of the following the next next year to file the actual amendment. But by that point, we had the customers and that's really the driver here. Right? You don't build these pipelines on spec. You can't. And so we told them, and it's the 2nd paragraph on that page, a redesigned project, extending about 31 miles from the terminus of the mountain valley pipeline. That's the point I made is that the gas is coming in from the same place. And I know it's a 30 inch pipe rather than a 30 inch pipe. And just to be clear, that segment, the Virginia segment was approved originally as 24 in. So, 24 to 30, it's increasing by 6 inches. Am I understanding the record or misunderstanding the record with respect to demand? I understand there's a new major customer now, right? And it seemed a little fuzzy when the question was asked somewhere. So precisely how much of what's going to be produced is guaranteed to be bought. Yes, so hopefully I can clarify the fuzziness. It was originally 300 for dominions, the originally certificated project, and we were proposing to build something slightly large in that. So there was 12,000. The easiest answer to that is we have now filed those precedent agreements with. Now, this is postdating. So I want to be clear as attachments to our amendment dominions. The same Duke took another 250. so that that is the answer. But, I mean, I take the point. What we, what we were able to do. We were able to tell the commission at the time, given that sometimes the relationship with customers, you need to try to have your discussions confidentially because they may decide to sign up. They may not decide to sign up here. We were telling them what we could about the contracts that we'd entered into. But you know what those contracts are. We filed them with FERC as part of the amendment. As to the conditions, Judge Edwards, this is commonplace in this industry. Remember that these precedent agreements are binding contractual commitments that parties enter into 20 year terms. Take or pay, so to speak, right? The customers are paying for the capacity to be available to them. All the time, whether they need it or not, right? That's that's the benefit to these depends on the conditions precedent in the correct. But what I can say, so so the version of the precedent agreements that were filed with the commission, they were filed in sealed and redacted version. The redactions did include these conditions, but what I can tell you generally is that the conditions are commonplace in these contracts. For instance, if FERC denies the certificate, right, this is these are contracts for service on a pipeline that you don't know whether it's going to exist. You sign these contracts before you've even applied to FERC. If other agencies deny the permit such that the pipeline can't go forward, it makes no sense to have a 20 year contract on something that doesn't exist. Also, if we can't do it in time. Right. We said that publicly, it's in the record here that our original contracts with Dominion, or if we couldn't get it done by December 2023, they had the ability to walk, but they didn't. Right. They signed up to extend because they need they need the gas. I have one last question for me, at least, which is this question about what happens in the interim while an amendment application is pending. So you can imagine situations in which the amendment is quite significant and it's it substantially changes the scope of the project. And so naturally questions will arise. Well, OK, well, you've got approval to do all kinds of stuff that's predicated on entirely different set of facts. Why should that approval carry over while you yourself have said you're changing this substantially? And this all deals with the amendment process. I get that. But it informs at least to some extent. And if it is a feedback mechanism, how we think about the extension request that we have for us today. I understand. So amendments are commonplace in the industry. These are big, complicated projects that can take a decade. You know, the permitting pathway is not always linear. So amendments frequently happen in the industry. I think from our perspective, an important thing is that the certificate is really the keystone authorization for these kinds of projects. Right. FERC is the lead agency. They're running the show. Here we had a certificate that was issued, challenged, upheld by this court. And so. In our view, under the Natural Gas Act, which has a judicial review provision that provides for prompt review after that process, the certificate is something that we can rely on and we make investments based on our customers are relying on. So I think the answer would be, yes, that certificate remains valid unless and until the commission amends it. And if we're coming to the commission asking for an amendment saying, look, we think it's going to be really hard to build the original project. We need to make these changes. The commission can deny the amendment. The commission can deny if we need another extension. They can deny another extension. But then but what happens, the authority? Because suppose that you decided you wanted and you represented that you're not going to. But if you decided you want to exercise eminent domain and a part of the project, the part of the original project, it's not actually not within the fold of the amendment. Let's just suppose that happened. Then how would how does that procedurally get worked out? Because that seems like a problem. It seems like, no, the project sponsor shouldn't be able to exercise eminent domain on the part of an original project that it's not even saying it wants to pursue. I understand that. And we are sensitive to the concern. I think we try to be very responsible in how we exercise the authority under the Natural Gas Act. If you have a certificate, Congress has conferred eminent domain. So I don't mean to be too blunt about that. The best way, in our view, to address the concern about landowners in North Carolina is for the commission to promptly process our amendment. We've asked to remove that segment as soon as they do that. Our eminent domain authority will not exist as to that part of the project. And just in case there's any question, we did voluntarily dismiss all of the eminent domain cases in North Carolina. There are none pending. I would note that none of the standing declarations in this case are from North Carolina landowners suggesting that there's a problem here. We have publicly said we want to change the project. We have formally applied to FERC. I understand the question about, well, is this sort of a cloud on title? Does that get worked out in the state proceeding, then, if you try to – there's a landowner. Correct. And you're trying to take over the property, and then they say, whoa, they filed an amendment already with the federal commission that says they don't even need eminent domain over here anymore. Correct. And I think it's also important – just filing a condemnation complaint does not give us anything. You file a complaint, and that initiates the case. And these cases can take years because you might have a disagreement with the landowner about the amount due for compensation, for instance, and you could have a trial on that. Now, there are some cases where the pipeline will ask for essentially preliminary relief, in other words, to get access to the property. Sometimes we do that because it's the only way we can do even something as simple as an environmental survey. There are cases where you need – But if you try to do any of this with respect to a part of the project that's not even a part of the project that you're seeking approval for anymore because it's cut off by the amendment, then I would imagine that in the state condemnation proceedings, that would come up as an obstacle to your proceeding. I am sure it would be litigated. And by very able counsel, there's a reason some of these condemnation cases take years and years. I will say, under the Natural Gas Act's review scheme, it vests exclusive jurisdiction in the court of appeals, this court in this case, to review the certificate. So if there is a challenge to the validity of the certificate, our position would be you can't re-litigate that in the condemnation case. I just want to be totally transparent. But, you know, it can take years, and we're hoping – and we've asked FERC to grant our amendment by the end of this calendar year. So we're hoping that whatever cloud exists over the North Carolina landowners, that it will soon be resolved. Make sure my colleagues don't have additional questions. Thank you very much. We ask that you do not petition. Mr. Luckett, we'll give you the two minutes that you asked for for rebuttal. Thank you, Your Honors. I'd just like to address a few quick points. First, Your Honor mentioned the issue of rightness. This case is right because petitioners are being injured right now by the challenged orders. Had FERC not granted those orders, the certificate would not be in place. Mountain Valley has said it plans to obtain outstanding easements prior to the end of 2025, prior to any action on its amendment request. So that injury is occurring now. Now, Your Honor asked about the ability to raise the pending amendment in the condemnation proceedings. In the controlling law where these proceedings are taking place, what the courts have said is we will not look behind a valid FERC certificate. We do not answer those questions. If there's a FERC certificate in place, we condemn. Now, questions of value and things are litigated there, but the power to condemn is not. That is granted by the FERC certificate. And so that interim validity of that certificate is what is causing the injury here. And now another point, I heard both counsel for FERC and the interveners talk about vacating the certificates, requiring them to start back at ground zero. And they, you know, in the interveners briefs, they talked about years of delay and millions and millions of dollars of cost. Petitioners don't believe there's any support for that. In a new application, the company could rely on existing analysis to the extent they remain valid in exactly the same way that it can in an amendment application. The primary difference would be that the certificate does not remain valid in the interim, conferring the extraordinary power of eminent domain for a project that the applicant has said it does not intend to construct. And for those reasons, the court should vacate the challenged orders and with them the underlying certificate. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Edwards